UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRIMITIVO CAMPOS,<br><br>Plaintiff,<br><br>v.<br><br>DANIEL STONE,<br><br>Defendant. | Case No.  15-cv-04298-VC<br><br>**ORDER GRANTING PETITION FOR A WRIT OF HABEAS CORPUS**<br><br>Re: Dkt. No. 1 |

## I.  INTRODUCTION

The habeas petitioner in this case, Primitivo Campos, was convicted in state court of molesting a child at the day care his wife ran in their home.  Aside from the child victim's testimony (which suffered from inconsistencies, was at times controverted by third party witnesses, and may have been influenced by a similar allegation her friend had recently made against a different person), the only evidence against Campos was an incriminating series of statements that investigators extracted from him during a custodial interrogation.  The investigators, in their attempt to get Campos to confess, performed fake fingerprint and DNA tests on him.  They insisted repeatedly and forcefully, but falsely, that the fake tests demonstrated to a certainty that Campos had touched the child's genitals.  When Campos continued trying to deny ever touching the child's genitals or molesting her in any way, the investigators repeatedly interrupted him and insisted that this could not possibly be the truth in light of the fingerprint and DNA evidence.  They yelled "no, no, no!", insisted their evidence "doesn't lie," and said things like: "Okay, so you're lying to us.  You have to tell us the truth." They emphasized that if Campos continued to deny the "truth" of the fingerprint and DNA evidence, the District Attorney would not like it.  Accordingly, the investigators repeatedly and

forcefully exhorted Campos to at least allow for the possibility that his hand might have touched the victim's genitals accidentally.  They refused to accept any statement from Campos that did not allow for this possibility.

Perhaps a more sophisticated person would have continued to insist he never touched the victim's genitals, either accidentally or on purpose.  But Campos had a third grade education from Mexico.  He had no prior experience with the criminal justice system, and clearly had difficulty understanding the evidentiary concepts the officers introduced to him.  It's no wonder, in light of the officers' exhortations, that Campos eventually felt compelled to allow for the possibility of an accidental touching.  Many people in the same position would react this way – particularly people as unsophisticated as Campos – whether they were guilty or innocent.

Throughout the remainder of the interrogation, Campos continued to insist he never intended to touch the victim inappropriately.  Indeed, at times he seemed to try to back away from the possibility that an accidental touching might have occurred, only to be steamrolled by the officers.  Eventually, Campos ended the interview and asked for a lawyer.

At trial, during closing argument, the prosecutor made effective use of Campos' statements, insisting that no innocent person would ever have allowed for the possibility of even an accidental touching.  And the jury convicted Campos of some counts, likely in reliance on Campos' statements and on the prosecutor's assertions about those statements.

The trial judge should never have allowed Campos' statements to be admitted.  And the two-justice majority on California's Sixth District Court of Appeal should never have voted to affirm the conviction on direct appeal.  In fact, the majority's ruling hinged on an objectively "unreasonable determination of the facts" within the meaning of the federal habeas statute.  28 U.S.C. 2254(d)(2).  In particular, the majority unreasonably determined that the officers were merely "urging the defendant to tell the truth," when in reality they were insisting that Campos allow for the possibility of an accidental touching regardless of what the real truth was, and insisting that the district attorney would not like it if Campos refused to make a statement consistent with their fake scientific evidence.  The majority's mischaracterization of what

happened during the interrogation reflects a plain misapprehension of the record, going to a material factual issue that was central to the defendant's claim. *Sharp v. Rohling*, 793 F.3d 1216, 1229 (10th Cir. 2015) (quoting *Byrd v. Workman*, 645 F.3d 1159, 1171 (10th Cir. 2011)); *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004) (citing *Wiggins v. Smith*, 539 U.S. 510, 526 (2003); *Hall v. Dir. of Corr.*, 343 F.3d 976, 983 (9th Cir. 2003)).  As the opinion of the dissenting justice shows, once this misapprehension is eliminated, and once the facts and the law are considered objectively, it is clear that Campos' statements to the interrogators were obtained in violation of his due process rights.  And because the admission of these statements was not harmless under *Brecht v. Abramson*, 507 U.S. 619 (1993), the petition for a writ of habeas corpus is granted.

## II.  FACTUAL BACKGROUND

Until the time of his arrest in December 2010, Campos regularly helped out at his wife's home day care facility.  His wife had been operating the facility for many years, and Campos had assisted her since 2000.  12 RT, Dkt. No. 16-3, at 3437; 11 RT, Dkt. No. 16-1, at 3055, 3071.[1] Campos sometimes watched children while his wife was in another room, and he regularly drove children by himself from the day care to school and back again.  12 RT, Dkt. No. 16-3, at 3438- 41, 3485; 11 RT, Dkt. No. 16-1, at 3070.  On December 22, 2010, a child at the day care, whose initials are K.M. and who was five years old at the time, told her mother that Campos had touched her genitals under her clothes.  Cal. Ct. App. Opinion, Dkt. No. 17-4, at 2.  The details of her accusation are discussed more fully in Section V.

After K.M.'s mother called the police, they arrested Campos, brought him to the station, took his fingerprints and a blood sample, put him in an interrogation room, and cuffed one of his hands to a table.  Cal. Ct. App. Opinion, Dkt. No. 17-4, at 2; 3 CT, Dkt. No. 14-5, at 482, 490. They advised Campos of his *Miranda* rights.  Cal. Ct. App. Opinion, Dkt. No. 17-4, at 2.

Before the interrogation began, Detective Emilio Perez entered the interrogation room

---

[1] This opinion will refer to the state court Reporter's Transcript by volume number and the initials "RT"; to the Clerk's Transcript by volume number and the initials "CT."

wearing blue rubber gloves, carrying a manila envelope and a cotton swab. Perez proceeded to swab Campos' fingers and hands, then placed the swab in the envelope and left the room. Several minutes later, Perez and another detective, Matthew DeLorenzo, returned and began interrogating Campos. During the interrogation, the investigators reminded Campos they had taken his fingerprints, told him they'd collected DNA from his blood and his hands, and told him they'd also collected DNA and fingerprint evidence from K.M.'s genitals. 3 CT, Dkt. No. 14-5, at 490, 494. They told Campos that the results of the DNA and fingerprint tests were "going to tell us the truth," and that if there was a match, they'd know he touched K.M.'s genitals inside her pants. *Id.* at 496, 500. DeLorenzo was the primary interrogator and asked questions in English; Perez attempted to translate to Spanish for Campos.

The DNA and fingerprint tests were a ruse, and as the Court of Appeal majority noted, that ruse "was a major theme of the interrogation." Cal. Ct. App. Opinion, Dkt. No. 17-4, at 3. While the officers were waiting for the supposed "results" of their tests, they told Campos that the technology was "very advanced," that their tests could detect a person's fingerprints on a child's body for up to a month after an incident, and that their tests could even tell which part of a person's body a particular DNA sample came from: from the head, the face, or the hands. 3 CT, Dkt. No. 14-5, at 493, 492, 491. At one point, the investigators also pretended to go to the laboratory to retrieve the results of the DNA and fingerprint tests, only to return several minutes later and explain they had to wait a little longer for the results to be complete. *Id.* at 493-94. Eventually, another officer brought the interrogators an envelope containing the fake test results. *Id.* at 497. Before opening the envelope, the officers said K.M. had told them that Campos touched her "inside her vagina," and also "on her butt." *Id.* Campos denied that he did so. *Id.* at 498. The officers said: "You need to speak with the truth. This is your last opportunity. Because the D.A. makes the decision. But if you lie to us and that evidence, we're going . . . we're going to send it and the other thing that you don't say, will look real bad for you." *Id.* at 501-02. The officers told Campos they were confident that "your DNA, your finger prints – your normal finger prints and the ones that have your DNA – are going to be on the body of that girl."

*Id.* at 503-04.  Campos nevertheless continued to deny touching K.M. in an inappropriate place. *Id.* at 502-03.  The officers then told him that if the results inside the envelope were blue, this would mean the results were positive.  *Id.* at 504.

Then the officers opened the enveloped and announced: "They're blue.  Okay, so you're lying to us.  You have to tell us the, the truth."  *Id.* at 505.  Campos continued strenuously to deny touching K.M.'s genitals.  *Id.* at 505.  They said to Campos: "But this is here, it doesn't lie. This doesn't tell us lies, okay.  What motive – this is the truth.  So you're going to tell me that you didn't do anything and the D.A. is going to see this, what's he going to say?  That it's – you're lying."  *Id.* at 506.

Campos continued to insist he did not touch K.M.'s genitals.  In an effort to get Campos to reconcile the allegedly irrefutable proof that he'd touched K.M.'s genitals with his story that he did not molest her, the officers introduced the possibility that he'd touched her there by accident: "So . . . possibly [it] was an accident that you touched her down there?" *Id.* at 508; *see also id.* at 505 ("Or . . .  maybe it was something that was [an] accident.").  When Campos continued to resist the idea that he touched K.M.'s genitals, even accidentally, the officers said: "The scientists already have your DNA.  If you lie to me, the D.A. isn't going to like that you're lying to me, okay."  *Id.* at 508-09.  Nevertheless, when the officers again inquired whether Campos touched K.M. "in her intimate part," Campos repeatedly responded, "no, no."  *Id.* at 511; *see also id.* at 507, 508, 513, 515.

At this point it bears noting that the written transcript does not tell the full story of the interrogation.  The transcript itself is jumbled, but the video and audio show just how much confusion reigned during the interrogation.  The officers were speaking to Campos quickly and loudly.  They were often speaking over one another – one in English and the other in Spanish. Some of DeLorenzo's English questions and statements were translated to Spanish by Perez; others were not.  When Campos speaks, it is difficult to determine which question or comment he is responding to, because the questions and comments come in such rapid fire succession, with people talking over one another, in different languages.  And often when Campos tried to

deny touching K.M.'s genitals, the officers often did not let him speak, quickly interrupting him to insist that his response was inconsistent with the scientific evidence and would create problems with the district attorney.

In any event, Campos eventually began to struggle to reconcile the irrefutable scientific evidence (which he clearly believed existed) with his insistence that he did not touch K.M.'s genitals.  He began (at the officers' invitation) to discuss the concept of accidentally touching K.M.'s skin, while continuing to deny touching her on or near her genitals under her clothes.  *Id.* at 508.  For example, at one point Campos said, "maybe I accidentally put my hands inside," but seconds later it became clear he was trying to say that perhaps he touched K.M.'s back underneath her clothes as he was pushing her away from a baby he was holding and that K.M was trying to kiss.  *Id.* at 520.  All the while, Campos referred back to the evidence that the officers continued to insist was irrefutable, saying things like, "that's why my hand evidence comes up," and "You've already found my finger prints." *Id.* at 514, 523.  The officers were not satisfied with Campos' answers, however, and when he continued to deny he had touched her inappropriately, the officers forcefully responded, "No, no, no.  We want to know the truth."  *Id.* at 516; *see also id.* at 519.  Eventually, in response to the officers' continued insistence that the evidence was irrefutable and that he must tell a "truth" consistent with that evidence, Campos appeared (although it's difficult to know for sure, given the chaotic nature of the interrogation) to allow for the possibility that he could have accidentally touched K.M.'s genitals under her clothes.  *Id.* at 521.  At one point the officers asked, "is that possible that when you pushed her it entered from above?"  "Maybe," Campos responded.  *Id.* at 536.  They asked, "could it possibly have been just like that?"  Campos responded, "Maybe, I don't know." *Id.* at 537.  They asked, "But it was an accident[?]"  Campos responded, "Maybe yes."  *Id.*

Shortly thereafter, Campos stated he needed an attorney, and the officers terminated the interrogation.  *Id.* at 539.  He was charged with two counts of sexual penetration with a child ten years of age or younger, in violation of Cal. Penal Code § 288.7(b), and five counts of committing a lewd or lascivious act on a child under 14 years of age, in violation of Cal. Penal

Code § 288(a).  1 CT, Dkt. No. 14-1, at 72-76.

# III.  PROCEDURAL BACKGROUND

Campos moved to suppress the statements he made during the interrogation on the ground that they were involuntarily made.  He argued that he was unsophisticated and that he had no prior experience with law enforcement.  2 CT, Dkt. No. 14-2, at 137.  He contended that, in light of his personal characteristics and in response to the interrogation tactics used against him, he was unable to resist allowing for the possibility that he could have accidentally touched K.M. in an inappropriate place.  *Id.* at 147.

The trial judge denied the motion.  Noting that Campos was 60 years old, she said: "Being that age myself, I don't see this as impairment.  So I don't see that as a characteristic that is a detriment to him."  6 RT, Dkt. No. 15-6, at 1531.  The trial judge also noted that Campos had "been in the workforce for 17 years," and had "raised five children."  *Id.*  In light of this, she appeared to conclude that Campos was not so unsophisticated as to warrant a change in the way she would normally analyze an interrogation: "So in looking at the characteristics of the accused himself, I don't think that there is anything of detriment that – that could overcome his will looking at only that factor or those set of factors separately."  *Id.* at 1531-32.

The trial judge then turned to the details of the interrogation itself.  She concluded that the officers' repeated insistence that the district attorney would react badly unless Campos told "the truth" was not problematic, because Campos never indicated, during the interrogation, that his statements were motivated by a desire to avoid upsetting the district attorney.  *Id.* at 1533-34.  Nor, the trial judge reasoned, is it improper for police officers to use "loud, aggressive, accusatory" interrogation tactics.  *Id.* at 1534.

The jury convicted Campos of one count of committing a lewd or lascivious act on a child under fourteen, in violation of Cal. Penal Code § 288(a), and one count of misdemeanor battery, in violation of Cal. Penal Code § 242, a lesser-included offense of one of the sexual battery charges.  3 CT, Dkt. No. 14-6, at 570-87.  The jury acquitted him of all other counts and lesser-included offenses.  *Id.*

The Sixth District Court of Appeal upheld Campos' convictions in a 2:1 decision.  On the admissibility of Campos' statements, the majority began by reciting the correct standard – namely, that a suspect's statement is involuntary if, considering the totality of the circumstances (including his personal characteristics and the details of the interrogation), his will was overborne.  Cal. Ct. App. Opinion, Dkt. No. 17-4, at 11-12.  Then the majority reached the following conclusion about Campos' personal characteristics:

> Regarding defendant, at 60 years old he was neither so old nor so young as to make him particularly susceptible to coercion.  There was also no evidence defendant suffered from any mental or physical disability that might make him more susceptible to coercive influence.  Defendant's level of sophistication is inconclusive because while he had no prior history with police, he raised five children and was a member of the workforce for a number of years.  Finally, we agree with the trial court that defendant did not appear fearful during the interrogation and his emotional state seemed stable.  Thus, the defendant's characteristics do not support a finding that his admission was involuntary.

*Id.* at 12.

The majority then opined that "[t]he details of the interrogation also do not support the defendant's argument."  *Id.*  The majority noted that the detectives' deceptive tactics weighed against a finding of voluntariness but did not preclude such a finding.  *Id.* at 13.  The majority described the officers as merely "urging defendant to tell the truth," and merely telling him that the district attorney would not like it "if" the defendant lied.  *Id.* at 14, 13.  "In sum," the majority concluded, "the People have shown by a preponderance of the evidence that the defendant's statements regarding the possibility of accidental contact were voluntarily made."  *Id.* at 14.

The dissenting justice concluded that Campos' statements were involuntary.  Cal. Ct. App. Opinion, Dkt. No. 17-4, at 12 (Marquez, J., dissenting).  He primarily took issue with two aspects of the majority's analysis.  First, he expressed concern that the majority had separated "the defendant's characteristics from the external details of the interrogation and the tactics used by the police," rather than considering all the circumstances together.  *Id.* at 1.  Second, he disputed the majority's assertion that the officers had merely urged Campos to tell the truth:

"having dictated 'the truth' to him, they made it abundantly clear that they would reject any statement inconsistent with it," and they "coupled their demands with implicit threats of harsher consequences" if Campos did not make a statement consistent with their fake evidence. *Id.* at 9. The dissenting justice also concluded that the trial court's error in admitting Campos' statements was not harmless.

Campos also claimed on appeal that his defense lawyer at trial was constitutionally ineffective for failing to object when the prosecutor, during closing argument, mentioned that Campos terminated the interrogation and requested a lawyer.  No member of the three-judge panel accepted that claim.

The California Supreme Court summarily denied Campos' petition for review.  Dkt. No. 17-6.

Campos raises two claims in his federal habeas petition, which the parties agree is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  His primary argument is that the state courts unreasonably determined that his statements were admissible.  Petition, Dkt. No. 1, at 20-37.  His secondary argument is that the state courts unreasonably rejected his ineffective assistance claim.  *Id.* at 37-44.

## IV. STANDARD OF REVIEW

Because the California Supreme Court summarily denied review, the Court reviews the California Court of Appeal's decision, which is "the last reasoned opinion" adjudicating Campos' claims.  *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1605 (2016) (quoting *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

AEDPA prescribes a "highly deferential standard for evaluating state-court rulings," one that embodies a "presumption that state courts know and follow the law."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).  Under AEDPA, a federal court may grant a habeas petition only if the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or

"resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. §§ 2254(d)(1), (d)(2).

A state court adjudication is "contrary to" clearly established federal law within the meaning of AEDPA if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 413 (2000); *see also, e.g.*, *Lafler v. Cooper*, 132 S. Ct. 1376, 1390 (2012) (state court decisions are "contrary to" Supreme Court law if they apply the incorrect standard to a constitutional claim).  "An *unreasonable* application of federal law is different from an *incorrect* application of federal law."  *Williams*, 529 U.S. at 410.  A state court's application of federal law is not unreasonable within the meaning of 2254(d)(1) "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  In other words, the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* at 103.  That standard is, by design, "difficult to meet."  *Id.*

A state court's factual determination is entitled to deference under section 2254(d)(2) "unless objectively unreasonable in light of the evidence presented in the state-court proceeding."  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  It is not sufficient that "the federal habeas court would have reached a different conclusion in the first instance."  *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).  Rather, before concluding a state court decision rests on an unreasonable factual determination within the meaning of section 2254(d)(2), the habeas court "must be 'convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record' before the state court."  *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir.) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004)), *cert. denied*, 135 S. Ct. 710 (2014).  Section

10

2254(d)(2) applies to "intrinsic review of a state court's processes, or situations where petitioner challenges the state court's findings based entirely on the state record." *Kesser v. Cambra*, 465 F.3d 351, 358 n.1 (9th Cir. 2006) (en banc) (quoting *Taylor*, 366 F.3d at 999-1000). Like the "unreasonable application" standard under 2254(d)(1), which is assuredly "difficult to meet," *Richter*, 562 U.S. at 103, the 2254(d)(2) "standard for finding that a state court made an unreasonable determination of the facts is 'daunting,' and 'will be satisfied in relatively few cases.'" *Jones v. Harrington*, No. 13-56360, Slip Op. at 12 (9th Cir. July 22, 2016) (quoting *Taylor*, 366 F.3d at 1000). However, a state court decision may rest on an unreasonable factual determination within the meaning of 2254(d)(2) where the state court "plainly misapprehend[s] or misstate[s] the record in making their findings, and . . . the misapprehension goes to a material factual issue that is central to the petitioner's claim." *Taylor*, 366 F.3d at 1001. And in the unusual case where the petitioner shows the state court's rejection of his constitutional claim rested on an unreasonable factual determination under 2254(d)(2), the habeas court proceeds to review the claim de novo. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 531 (2003); *Sharp v. Rohling*, 793 F.3d 1216, 1228 (10th Cir. 2015) (citing *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011)).

# V. DISCUSSION

## A.

With respect to the admissibility of his statements to the police, Campos primarily argues that the petition should be granted under section 2254(d)(1) because the Sixth District Court of Appeal majority opinion was contrary to or an unreasonable application of clearly established Supreme Court precedent. Campos is correct to a point – the majority's legal analysis contains various analytical flaws. But the flaws in the majority's opinion do not, in light of AEDPA's highly deferential standard, warrant habeas relief under section 2254(d)(1).

For example, although the majority intoned the correct "totality of the circumstances" standard for assessing the voluntariness of Campos' statement, as the dissenting justice observed, it appears the majority disassociated Campos' personal characteristics from the circumstances of

11

the interrogation.  Cal. Ct. App. Opinion, Dkt. 17-4, at 1 (Marquez, J., dissenting).  The majority first turned to Campos' characteristics, deciding that Campos wasn't particularly unsophisticated.  Cal. Ct. App. Opinion, Dkt. No. 17-4, at 12 (maj. op.).  And then it turned to an analysis of the circumstances of the interrogation, seemingly conducting that analysis in a vacuum, without regard to Campos' characteristics.  *Id.* at 13-14.  The Court of Appeal majority (as well as the trial judge) seemed to assume that unless Campos fell below some threshold level of sophistication (that is, unless Campos was really, really unsophisticated), his characteristics need not be considered *at all* when assessing whether the officers conducted the interrogation in a manner that could give rise to an involuntary statement.  What's more, the majority appeared to analyze the various circumstances of the interrogation in isolation, to determine if any one aspect of the interrogation *independently* was categorically prohibited or capable in and of itself of producing an involuntary confession.

     If that's what the majority was doing, it would be contrary to clearly established Supreme Court case law.  Rather than inquiring whether Campos fell below some random threshold level of sophistication, or whether any of the individual tactics employed was problematic in isolation, the majority should have simply inquired whether the will of a person like Campos would have been overborne by the combination of the particular tactics used by the officers, such that he would have been compelled to make the statements about accidental touching that they wanted him to make.  "The due process test takes into consideration 'the totality of all the surrounding circumstances—*both* the characteristics of the accused *and* the details of the interrogation."  *Dickerson v. United States*, 530 U.S. 429, 434 (2000) (emphases added) (quoting *Schneckloth v Bustamonte*, 412 U.S. 218, 223 (1973)).  For that reason, "[c]ourts must 'weigh, rather than simply list,' the relevant circumstances, and weigh them not in the abstract but 'against the power of resistance of the person confessing.'"  *United States v. Preston*, 751 F.3d 1008, 1017 (9th Cir. 2014) (en banc) (quoting *Doody v. Ryan*, 649 F.3d 986, 1015-16 (9th Cir. 2011) (en banc)).  However, notwithstanding this possible flaw in the majority's approach, the majority recited the correct standard, both at the beginning and the end of its voluntariness analysis.  And when a

state court ruling is ambiguous in this way, a federal court is to presume that the state court applied the correct standard.  *See, e.g.*, *Visciotti*, 537 U.S. at 24 (2002) (federal courts must presume "that state courts know and follow the law").  Accordingly, the majority's legal analysis in this regard was not "contrary to" clearly established Supreme Court law within the meaning of AEDPA.

A second and related problem lies in the majority's conclusion that the manner in which the officers conducted the interrogation was not unduly coercive.  In reaching this conclusion, the majority neglected to recognize that far less coercion is needed to extract an involuntary statement of *this* type.  In most cases, when a suspect alleges that the police coerced a statement out of him, the statement is a true "confession."  By contrast, in this case, although the statements were incriminating, Campos never actually confessed to the crime.  Rather, he attempted to reconcile, in response to the officers' demands that he do so, the allegedly irrefutable "scientific" evidence that he touched K.M.'s genitals with his insistence that he did not molest her.  It seems obvious – and counsel for the respondent did not dispute this point at the habeas hearing – that far less coercion is needed before a suspect will start feeling compelled to make a statement of this type.  And a person of limited sophistication, such as Campos, is particularly susceptible to this type of coercion.  It's one thing for officers to tell a suspect, "your buddy says you did it."  Even someone like Campos would conclude he has multiple options for how to respond to that question, such as "he's lying," or "you're lying."  It's quite another thing to insist to someone like Campos, after conducting fake fingerprint and DNA tests, that science has irrefutably proven something he is denying.  In that scenario, it's no surprise that someone like Campos would, in response to the officers' insistence that he must at least allow for the possibility of an accident, conclude he has no choice but to do so.  But again, as problematic as the majority's analysis may have been on this point, it does not warrant habeas relief under section 2254(d)(1).  Because the Supreme Court has not had an opportunity to hold that far less coercion is required to extract an involuntary statement of this type (as opposed to a full confession) from a suspect like Campos, the majority's failure to consider the issue here cannot be deemed contrary to, or an unreasonable

application of, Supreme Court case law.

**B.**

Alternatively, Campos argues that the majority's ultimate conclusion that Campos' statements were voluntary was "an unreasonable determination under the facts of this case." Petition, Dkt. No. 1, at 20.  Although Campos does not explicitly invoke section 2254(d)(2), his challenge to the state court's voluntariness determination is properly construed as seeking habeas relief under section 2254(d)(2) as well as section 2254(d)(1).  *See Sharp*, 793 F.3d at 1226.  As previously noted, where state courts "plainly misapprehend or misstate the record in making their findings, and . . . the misapprehension goes to a material factual issue that is central to the petitioner's claim," that may render the state court's resulting factual finding objectively unreasonable within the meaning of section 2254(d)(2).  *Taylor*, 366 F.3d at 1001.  For example, in *Sharp v. Rohling*, the Tenth Circuit granted habeas relief under section 2254(d)(2) after concluding that the state court's determination that the petitioner's confession was voluntary was based in large part on the unreasonable finding that the police officer interrogating her had made no promises of leniency.  793 F.3d at 1229-30.  The state courts had found that the petitioner "was not operating under any promises" of leniency, because, according to the state courts, the interrogating officer "simply urged Ms. Sharp to be truthful or made a promise conditioned on Ms. Sharp not inculpating herself."  *Id.* at 1230.  But that, *Sharp* held, was "not a plausible reading of the interview."  *Id.*  *Sharp* explained that, after the petitioner implicated herself in the crime, she asked the officer "if she was going to jail," to which the officer "responded with an unequivocal, 'no,' which he repeated  . . . nine more times."  *Id.*  The only reasonable reading of the interview, *Sharp* concluded, was that the officer had made a promise to the petitioner that she would be treated leniently even though she had just inculpated herself.  Accordingly, *Sharp* held, the state court's voluntariness determination rested on an objectively unreasonable finding of fact.  *Id.*  *Sharp* therefore proceeded to evaluate de novo whether the petitioner's confession after the detective's promise of leniency was voluntary, concluding that it was not.  *Id.* at 1233.

Even more recently, the Ninth Circuit held that the state courts made an unreasonable

14

factual determination under section 2254(d)(2) when they concluded a suspect's clear statement during an interrogation, "I don't want to talk no more," was not an unambiguous invocation of the right to remain silent. *Jones*, No. 13-56360, Slip. Op. at 4, 13, 23. In other words, it was objectively unreasonable for the state courts to mischaracterize that clear statement as ambiguous. *See id.* at 13, 23.

In this case, the Court of Appeal majority a made similar, and similarly egregious, factual error in its findings about what happened during the interrogation. Specifically, the majority mischaracterized what the officers were doing when they refused to accept Campos' denials that he touched K.M.'s genitals. In determining that the police officers had not made improper promises of leniency, the majority noted that "mere exhortations by interrogators to tell the truth are permissible," and then concluded that the officers' refusal to accept Campos' denials, and their insistence that he provide a statement consistent with the fake DNA and fingerprint evidence, "are more properly characterized as urging defendant to tell the truth." Cal. Ct. App. Op., Dkt. 17-4, at 13, 14. Although it's technically true that the officers made no direct promise of leniency, the majority's determination that the officers were merely "urging defendant to tell the truth" was an objectively unreasonable characterization of what the officers did in the interrogation. The officers did not merely urge Campos to tell the truth. They insisted, loudly and repeatedly, and in rapid-fire fashion, that he must give a statement consistent with their fake DNA and fingerprint evidence, which they insisted *was* "the truth." 3 CT, Dkt. No. 14-5, at 506. Indeed, as discussed more fully in Section II, the officers were quite explicit that Campos needed to give an explanation consistent with their "results": referring to the fake evidence, Perez told Campos: "If you tell me something, and this says something else, it's going to look very bad for you or that, that you lied to me." *Id.* at 499. Whenever Campos refused to allow for the possibility of accidental touching, they refused to accept his response, and told him that the district attorney would be unhappy with him if he continued to give an account contrary to their supposedly incontrovertible scientific evidence.

In a similar mischaracterization of the same facts, the majority described the officers as

telling Campos that it would look bad for him "*if* his statements were inconsistent with the supposed DNA evidence." Cal. Ct. App. Op., Dkt. 17-4, at 13 (emphasis added).  The majority's use of the word "if" suggests that the officers were impliedly conceding that Campos' denials might not be contrary to the scientific evidence.  But in actuality, the officers repeatedly telegraphed to Campos that it was going to look bad for him *because* his statements were *indisputably* inconsistent with the supposed fingerprint and DNA evidence.  Indeed, the officers insisted that the only way it would not "look bad for him" was if he *changed* his statements to acknowledge the possibility of an accidental touching.[2]

Insisting a suspect will be in trouble with the prosecutor unless he makes a statement consistent with fake scientific evidence, which the officers repeatedly characterize as the objective "truth," is vastly and categorically different from merely urging a suspect to tell the truth in a vacuum.  The majority's determination that the officers were merely urging Campos to tell the truth is "not a plausible reading of the interview."  *Sharp*, 793 F.3d at 1230.  It thus reflects a plain misapprehension or misstatement of the record.  *Taylor*, 366 F.3d at 1000.  And this flawed determination "goes to a material factual issue that is central to" Campos' due process claim.  The state court's decision therefore rests on an "objectively unreasonable" factual determination within the meaning of section 2254(d)(2).  *Miller-El*, 537 U.S. at 340.

## C.

---

[2] At another point in its opinion, the majority stated that the record was not clear on whether the officers or Campos introduced the possibility that Campos had accidentally touched K.M.'s genitals.  It's difficult to understand how the majority could have said that, because the transcript makes it clear that the officers introduced the concept and invited Campos to buy into it.  3 CT, Dkt. No. 14-5, at 505.  Even counsel for the respondent conceded this issue at oral argument.  At yet another point in its opinion, the majority waved away the fact that Campos was handcuffed during the interrogation, citing testimony from Officer DeLorenzo that this was his department's standard practice, and noting that Campos did not complain of discomfort.  Cal. Ct. App. Opinion, Dkt. 17-4, at 2, 13.  It's difficult to understand how the majority could believe that the coercive influence of the handcuffs on Campos was somehow diminished simply because the officers handcuffed other people too (especially since Campos had never experienced anything like this before).  Although these misstatements are not as egregious, or as central to Campos' due process claim, as the majority's factual misstatement that the officers were merely "urging defendant to tell the truth," they further reflect the majority's mischaracterization of the record of the interrogation in this case.

Because the state courts' conclusion that Campos' statement was voluntary was based on an objectively unreasonable determination of the facts, the Court must proceed to analyze Campos' due process claim de novo. *See Wiggins*, 539 U.S. 510, 531 (2003); *Sharp*, 793 F.3d at 1228.

As previously noted, the due process voluntariness test "takes into consideration 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'" *Dickerson*, 530 U.S. at 434 (quoting *Schneckloth*, 412 U.S. at 226). "The determination 'depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing.'" *Id.* (quoting *Stein v. New York*, 346 U.S. 156, 185 (1953)). It "'is not limited to instances in which the claim is that the police conduct was inherently coercive,' but 'applies equally when the interrogation techniques were improper only because, in the particular circumstances of the case, the confession is unlikely to have been the product of a free and rational will." *Preston*, 751 F.3d at 1016 (quoting *Miller v. Fenton*, 474 U.S. 104, 110 (1985)).

Campos' statements were not voluntary, largely for the reasons articulated by the dissenting justice in the Court of Appeal. "Campos was not sophisticated according to any relevant definition of that term." Cal. Ct. App. Opinion, Dkt. No. 17-4, at 10 (Marquez, J., dissenting). Campos "grew up in Mexico, where he left school in the third grade. He spoke little English, and he had worked as a farm laborer and a forklift driver for most of his life." *Id.* Campos "had no criminal record, he had never been arrested, and he had no experience with police interrogations." *Id.* His responses during the interrogation made clear he had no familiarity with the evidentiary matters the officer discussed with him. Nor, contrary to the apparent view of the trial judge and the Court of Appeal majority, is it necessary to conclude that a suspect has some actual disability (say, a learning disability) before considering how the suspect's characteristics interacted with the circumstances of the interrogation. Either way, Campos' personal characteristics "made him highly susceptible to the officers' aggressive tactics." *Id.* at 10.

To be sure, officers are not barred from using deception.  But the law provides that the use of deceptive tactics cuts against voluntariness.  *See, e.g.*, *Frazier v. Cupp*, 394 U.S. 731, 739 (1969); *Preston*, 751 F.3d at 1026; *Ortiz v. Uribe*, 671 F.3d 863, 869 (9th Cir. 2011).  And the officers' deception must be considered in light of all the circumstances, including the nature of the deception itself.  After all, there are different kinds of deception – telling a suspect that his buddy ratted him out is one thing; an elaborate ruse involving fabricated scientific evidence is quite another, particularly when the officers rely so heavily on that ruse, while interrogating a suspect who was so unsophisticated.

Moreover, the interview itself was chaotic and confusing, with the officers frequently talking over Campos and each other.  Every time Campos tried to deny that he had touched the victim's genitals (or touched her there other than accidentally), the officers aggressively rejected his statements (often refusing to let him finish his sentences) and told him their tests conclusively proved otherwise.  At one point, DeLorenzo interrupted Campos' explanation that maybe he had at most accidentally touched the girl's torso and not her genitals by shouting "No, no, no, no, no, no," while leaning forward and wagging his finger inches from Campos' face. 3 CT, Dkt. No. 14-6, at 519.[3]  When Campos again tried to deny that he touched her, DeLorenzo leaned forward further to shut him up, told him to "Calm down" in Spanish, and again said "No, no, no." *Id.*  It was clear from this and many other interactions that DeLorenzo and Perez would accept nothing other than a statement that Campos had touched the victim's genitals at least accidentally.  As Justice Marquez explained, the police were "unrelenting" in their insistence that Campos accede to their version of the truth ("a version that was, of course, predicated on lies," i.e. the fake forensic evidence), and indeed were actively hostile to any attempts by Campos to give explanations inconsistent with their supposed "results."  Cal. Ct. App. Opinion, Dkt. No. 17-4, at 9 (Marquez, J., dissenting).

And their hostility came with the clear implication that Campos risked harsh

---

[3] In fact, though the written transcript suggests DeLorenzo repeated the word "no" only six times at this point, the video reflects it was easily more than a dozen times, in rapid-fire succession.

consequences if he did not accede to their version of the facts: they repeatedly told him the district attorney wouldn't like it if he didn't tell them something consistent with their DNA and fingerprint evidence.  While those invocations of the district attorney were not per se impermissible, it does not follow that they are irrelevant.  The officers' message that Campos would be treated more harshly if he did not admit to accidental touching, combined with all the other circumstances, weighs heavily against finding Campos' confused responses to the interrogators were voluntary.[4]  *See, e.g.*, *Ortiz*, 671 F.3d at 869.

For all these reasons, it should be no surprise that someone like Campos would eventually feel compelled to allow for the possibility of an accidental touching in response to the officers' vehement, often shouted, and frequently repeated exhortations to give a statement consistent with his fingerprints and DNA being on the child's genitals, particularly when he was in close physical proximity to that child on a regular basis.  Indeed, under similar circumstances, even a person of greater sophistication and psychological fortitude than Campos could well have felt compelled to allow for the possibility that "maybe" he could have accidentally touched the victim in some way.  As for Campos himself, it is clear that his statements in this case are inherently unreliable and were involuntary under the totality of the circumstances.  *See Preston*, 751 F.3d at 1016.

## D.

---

[4] It also bears noting that the officers used interrogation methods apparently influenced by the "Reid technique."  4 RT, Dkt. No. 15-4, at 1014; 3 RT, Dkt. No. 15-3, at 6.  The Reid technique "is designed to get suspects to incriminate themselves by increasing the anxiety associated with denial and minimizing the perceived consequences of confession."  Saul M. Kassin, *On the Psyhology of Confessions: Does Innocence Put Innocents at Risk?*, 60:3 Am. Psychologist 215, 219 (April 2005).  The scientific community is coming to realize that the Reid technique has a strong tendency to elicit false confessions as well as true ones.  *See, e.g.*, Melissa B. Russano et al., *Investigating True and False Confessions within a Novel Experimental Paradigm*, 16:6 Psychological Science 481 (2005); *see also* Saul M. Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34:3 Law & Hum. Behavior 3 (2010); Welsh S. White, *False Confessions and the Constitution: Safeguards Against Untrustworthy Confessions*, 32 Harv. C.R.-C.L. L. Rev. 105, 119 (1997).  Other countries, including Canada and the United Kingdom, have phased out the use of the Reid technique in favor of interrogation methods that psychologists believe are less likely to result in false confessions or unreliable statements.  *See* Douglas Starr, *The Interview*, The New Yorker, Dec. 9, 2013, at 48-49.

Admitting a defendant's involuntary statement in violation of the Fifth and Fourteenth Amendments is subject to harmless-error analysis – that is, if the erroneous admission of his statements was nevertheless harmless, the defendant is not entitled to relief.  *See Arizona v. Fulminante*, 499 U.S. 279, 310 (1991).  Because the Court of Appeal majority determined that Campos' statements were admissible, it did not analyze whether admitting Campos' statements was harmless.  This Court therefore must analyze harmlessness in the first instance to determine whether Campos is entitled to relief for the violation of his due process rights.  *Taylor*, 366 F.3d at 1016; *see also Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015).

Federal courts apply *Brecht v. Abrahmson*, 507 U.S. 619 (1993) on collateral review to determine whether trial error of this sort was harmless.  *See Davis*, 135 S. Ct. at 2199 (citing *Brecht*, 507 U.S. at 637).  To be entitled to relief, Campos must show there is "more than a 'reasonable possibility' that the error was harmful."  *Id.* at 2198 (quoting *Brecht*, 507 U.S. at 637).  Under *Brecht*, "relief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict.'"  *Id.* at 2197-98 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).

It's highly likely that the erroneous admission of Campos' statements had a substantial and injurious effect in determining the jury's verdict.  *Id.*  As Justice Marquez noted, the evidence against Campos was otherwise weak, and in fact, "without Campos' statement, the only evidence against him consisted of K.M.'s uncorroborated statements, which were inconsistent and contradicted by other evidence."  Cal. Ct. App. Opinion, Dkt. No. 17-4, at 12 (Marquez, J., dissenting).  The jury "clearly discredited some of her statements, as demonstrated by the acquittals on six of the seven charged counts."  *Id.* at 13.  Moreover, as Justice Marquez observed, "the prosecutor in his cross-examination and closing argument relied heavily on Campos' interrogation.  Focusing on snippets of the interrogation taken out of context from a poorly translated, misleading transcript, the prosecutor contended the admissions of accidental touching proved that Campos sexually molested K.M."  *Id.*  And "it appears the jury attached some significance to the interrogation because they requested [and received] a copy of the

transcript as well as the video at the start of deliberations." *Id*; 16 RT, Dkt. No. 16-9, at 4303-04.

In her interview with Detective Vidal on December 23, 2010, K.M. claimed that Campos' hand "went inside" her vagina, and that he also touched her on her "butt," and that he did this to her "[e]very time," she went to Campos Daycare, "just every time," "[e]ven when [she] was in the car."  3 CT, Dkt. No. 14-5, at 462, 463.  K.M. then described to Detective Vidal two different occasions on which she said Campos had touched her inappropriately: once in his car, when she was "looking in his trunk," and once, the day before the interview, in the living room at the day care.  *Id.* at 464, 470.  As to the latter, K.M. claimed she had been playing with her friends when Campos "touched it," that two other children saw Campos touch her genitals, and that one of them "started laughing."  K.M. explained that the other child had laughed because "she thought it was funny."  *Id.*  K.M. claimed that on this occasion Campos had put his "whole hand" inside of her "wee-wee hole."  *Id.* at 472, 471.  K.M. also explained that he had taken her pants off "to show [her] legs" before molesting her in the living room.  *Id.* at 477.

K.M. also claimed she had reported the incident to Campos' wife, Celia, but that Celia did not believe her and walked away.  *Id.* at 473-74.  K.M. also claimed that Celia had not seen the incident in the living room, because Celia was at a different job at the time: "She works somewhere else . . . she has two works."  *Id.* at 467.  The unrefuted evidence at trial was that Celia did not have a second job.

As to the incident in the car, K.M. first claimed in the December 2010 interview with Detective Vidal that she was wearing pants when it happened, and that Campos had "just stuffed his hand in there."  But then she said he took her pants off the "[s]ame way [as] in the living room."  *Id.* at 477, 478.  And although K.M. claimed that it happened "all the time," she could not recall any other incidents.  *Id.* at 478.

At the preliminary hearing, at which time she was six years old, K.M. again stated that two other children were present in the living room when Campos molested her, that one of them, C.C., saw Campos touch her, and that C.C. laughed.  1 CT, Dkt. No. 14-1, at 5, 45.  K.M. also testified at the preliminary hearing that Campos had put his entire hand inside her vagina, that

"all the fingers went in there."  *Id.* at 48.

By the time she testified at trial, K.M. was seven years old.  8 RT, Dkt. No. 15-8, at 2118. As to the incident in the day care on December 22, K.M. claimed at trial that she had not been playing with friends, but rather was "on a sleeping bag" or in a sleeping bag on the floor of the living room at nap time when Campos touched her.  *Id.* at 2122-23.  And when the prosecutor asked whether Campos "put his finger inside of your wee-wee" in the living room, K.M. answered, "No, I don't think so."  *Id.* at 2129.  K.M. also testified that Campos had touched her "inside" her clothes when she was in the back of the car.  *Id.* at 2131.  K.M. further testified on direct examination that Campos touched her, "like, almost every day," and that "Maybe, like, one day he didn't."  *Id.* at 2133, 2132.  On cross examination, however, K.M. testified instead that it was "not every time," and that "Sometimes he did not do it."  *Id.* at 2142.  K.M. also claimed that although Campos "did it other times too," she couldn't remember or describe another incident other than the incident in the living room and the incident in the car.  *Id.* at 2157.

K.M. also stated on direct that Campos did not touch her "around the [other] kids," and that the other children "did not see."  *Id.* at 2133.  On cross, when K.M. was reminded that she had previously reported that the other children were present during the incident in the living room, K.M. then claimed the other children were present, but sleeping, which was why they didn't see.  *Id.* at 2158-59.  As to the incident in the car, K.M. testified that she was in the back of the car when it occurred, that the car was stopped and that she was looking at Christmas lights, and that although she had been in the child safety chair, she had "unbuckled" and sat on the chair next to it when Campos touched her.  *Id.* at 2131, 2153.  K.M. did not recall telling Detective Vidal that Campos had put his whole hand inside her vagina, or that she had told Celia and that Celia did not believe her.  *Id.* at 2155-56, 2157.  K.M. also did not recall telling Detective Vidal that the other children had seen and laughed.  *Id.* at 2156.  K.M. did not say that Campos had removed her pants.  She said that on both occasions she thought she was in fact wearing a skirt. *Id.* at 2127, 2131.

Other evidence at trial cast significant doubt on K.M's claims.  For example, K.M.'s

initial claim to Detective Vidal, also repeated at the preliminary hearing, that another child, her friend C.C., had seen Campos touch her at the day care and had laughed, was contradicted by C.C., who testified that she had never seen Campos "do anything bad" to K.M. or anyone else at the day care.  12 RT, Dkt. No. 16-3, at 3346, 3345.  Moreover, C.C.'s mother, Jonella Neaman, testified that C.C. had earlier in 2010 reported that her own father was molesting her at night.  *Id.* at 3331-32.  Neaman testified that she had informed K.M.'s mother about C.C.'s molestation while both girls, K.M. and C.C., played nearby.  *Id.* at 3312.  K.M.'s mother herself apparently was unsure whether K.M. was telling the truth, and wondered if K.M fabricated the story in response to learning about C.C.'s own molestation.  *Id.* at 3364.  In addition, K.M.'s claim to Detective Vidal, which K.M. repeated at the preliminary hearing, that Campos had put his "whole hand" inside her on December 22, 2010, was controverted by the medical exam conducted the next day, which showed K.M. had an intact hymen, and had no obvious trauma to her genitals.[5]  Cal. Ct. App. Opinion, Dkt. No. 17-4,  at 14 n. 4 (Marquez, J., dissenting); 12 RT, Dkt. No. 16-3, at 3413-16.  And K.M.'s testimony at trial that Campos had molested her while she was in a sleeping bag was contradicted by evidence that the day care did not have sleeping bags and indeed that sleeping bags were prohibited by state licensing requirements for day care centers.  11 RT, Dkt. No. 16-1, at 3066; *see also* 12 RT, Dkt. No. 16-3, at 3446.

These inconsistencies and contradictions, of course, do not prove that Campos did *not*

---

[5] At trial, the prosecution also called Mary Ritter, a physician's assistant who participated in the medical examination of K.M. promptly after K.M. first made her allegations.  Incredibly, Ritter at first testified that the examination results were "consistent" with a sexual assault, even though the exam results were "normal."  11 RT, Dkt. No. 16-1, at 3040.  However, Ritter immediately explained that the reason she believed the results were "consistent" with a possible sexual assault was that "the vast majority of children that we see, even when they come describing painful sexual contact, have normal exams."  Cal. Ct. App. Opinion, Dkt. No. 17-4, at 7; *see also* 11 RT, Dkt. No. 16-1, at 3040.  Ritter later clarified that by "consistent" with a sexual assault, she meant that it was merely "possible."  11 RT, Dkt. No. 16-1, at 3049.  In other words, Ritter's actual testimony was that the medical examination was entirely inconclusive – it made it neither more likely nor less likely that K.M. could have been touched inappropriately.  Thus, although the respondent tepidly suggests that Ritter's testimony corroborated K.M.'s account, that suggestion does not pass the straight face test.  And as previously noted, the medical exam's finding that K.M. had an intact hymen was certainly inconsistent with K.M.'s assertions that Campos had put his "whole hand," with "all the fingers," inside her vagina.

molest K.M.  Although children are more suggestible and more likely to fabricate stories entirely, they are also more likely (even when their basic story is not a fabrication) to embellish or misremember things, or to make inconsistent statements.  The question here is not whether K.M.'s allegations were false; it is whether the jury would have credited her allegations absent the statements from the interrogation.  And it's already clear the jurors had serious concerns about the accuracy of significant portions of K.M.'s testimony, given that they acquitted Campos of the charges of sexual penetration, and indeed of most of the charges and lesser-included offenses.  Cal. Ct. App. Opinion, Dkt. No. 17-4, at 18 (Marquez, J., dissenting).

In this case, as in other situations where it is necessary to assess the harm of trial error, "[t]he likely damage" of the improper admission of Campos' statements is perhaps "best understood by taking the word of the prosecutor," who relied heavily on Campos' admissions not only in cross-examination but also in his closing arguments.  *Kyles v. Whitley*, 514 U.S. 419, 444 (1995).  As Justice Marquez noted, "the prosecutor confronted Campos with 14 separate excerpts from the transcript, which the prosecutor displayed on an overhead projector for the parties and jurors to observe."  Cal. Ct. App. Opinion, Dkt. No. 17-4, at 18 (Marquez, J., dissenting).  Not only did the prosecutor "repeatedly press[] Campos to admit he had made the statements in the transcript," *id.*, he also "quoted many of Campos' statements out of context, taking advantage of the poorly created transcript" and the confusion that reigned in the video of the interrogation.  *Id.* at 20.  At closing argument,

> the prosecutor quoted from several portions of the statement in which Campos discussed accidentally touching K.M.  The prosecutor argued that "a truly innocent person," even when confronted with false evidence, would never admit to accidentally touching the victim. "Any individual confronted with that kind of evidence, if they did nothing, would maintain their innocence always."

*Id.*  Moreover, "the prosecutor argued that Campos' demeanor showed he was guilty because an innocent person would have been outraged if they were falsely accused of molesting a child."  *Id.* The jury could conclude Campos was in fact guilty, according to the prosecutor, because he was "insufficiently outraged" by the accusations of molestation in the video of the interrogation.  *Id.*

In sum, there were only two real pieces of evidence against Campos: K.M.'s allegations, and Campos' statements to the officers.  Under these circumstances, it's highly likely that the admission of his statements had a substantial and injurious effect on the jury's verdict.  *Davis*, 135 S. Ct. at 2197-98 (quoting *O'Neal*, 513 U.S. at 436).[6]

## VI.  CONCLUSION

The petition for a writ of habeas corpus is granted, and Campos' conviction is set aside. The state must notify the Court within 90 days if it intends to retry Campos, and it must commence retrial within a reasonable time in light of the existing circumstances.

**IT IS SO ORDERED.**

Dated:

_____

VINCE CHHABRIA
United States District Judge

---

[6] Because the Court is granting habeas relief on Campos' due process claim, it need not consider Campos' alternative ineffective assistance claim.